**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JACOB L. MARTIN,**

        **Petitioner,**                  **CASE NO. 2:08-cv-1073**
                                        **JUDGE GRAHAM**
**v.**                                   **MAGISTRATE JUDGE PRESTON DEAVERS**

**ROD FRANCIS,[1]**

        **Respondent.**

<u>**REPORT AND RECOMMENDATION**</u>

       Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the instant petition, Respondent's return of writ, Petitioner's traverse, and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

**FACTS and PROCEDURAL HISTORY**

       The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> The Franklin County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01, with a firearm specification pursuant to R.C. 2941.145. The charge involved a December 2005 shooting incident that resulted in the death of Tamara Moore.
>
> Appellant pled not guilty to the charge, and a jury trial ensued. At trial, plaintiff-appellee, the State of Ohio, amended the

---

      [1]  Rod Francis is the Assistant Chief of the Bureau of Medical Services at the Corrections Medical Center where petitioner is incarcerated.  *See Return of Writ*, n.1.

charge against appellant from aggravated murder to murder.

Yvonne Gardner, a police dispatcher for the Columbus Police Department, testified as follows on behalf of appellee. During the early morning hours of December 8, 2005, Gardner received a 911 call from appellant. Appellant indicated that "[s]omebody was playing with a gun" and "[s]omebody shot the [m]yself accidentally" in the head. (Vol. II Tr. at 61.) Appellant clarified that he was referring to his girlfriend. Appellant stated that he was arguing with his girlfriend, and she was waving a gun at him. Appellant stated that he was trying to get her to stop waving the gun at him, and, ultimately, the gun fired.

Officer Arkadiusz Augustyniak testified that he went to appellant's residence after the 911 call. Ultimately, he placed appellant in a police cruiser. While in the police cruiser, appellant stated that his "girlfriend had obtained a gun earlier * * * during an argument." (Vol. II Tr. at 95.) On cross-examination, Officer Augustyniak testified that appellant also told him that he tried to grab the gun from his girlfriend.

Officer Terry Stuart also went to appellant's residence after the 911 call. Officer Stuart testified that he noticed Moore lying on the floor with a firearm by Moore's right hand. Moore had a gunshot wound on the left side of her head.

Paramedic Thomas Frederick testified that he went to appellant's residence after the 911 call. While at the residence, the paramedic heard appellant say "we got in an argument and she's back here and she accidentally shot herself." (Vol. III Tr. at 50-51.)

Martin Lewis is a forensic scientist from the Bureau of Criminal Identification and Investigation. Lewis testified that he tested gunshot residue on the hands of appellant and Moore. "Particles highly indicative of gunshot primer residue were identified on one of the samples from the hands of Tamara Moore." (Vol. III Tr. at 79.) In addition, "particles highly indicative of gunshot primer residue were also identified on one of the hands of the samples of [appellant]." (Vol. III Tr. at

79.) Lewis explained that "[a] positive finding on samples from somebody's hands means that that individual either fired or discharged a firearm, was in close proximity to a firearm when it was discharged or that they handled something that already had gunshot residue on it." (Vol. III Tr. at 79.) On cross-examination, Lewis verified that he had no opinion as to how the shooting occurred.

Moore's mother, Kathleen Moore-Bryce, testified as follows on behalf of appellee. On December 5, 2005, Moore-Bryce talked to her daughter by phone. Her daughter was crying because she and appellant were arguing. Moore-Bryce's daughter stated appellant "choked her and [appellant] said he choked her because [Moore] hit him." (Vol. III Tr. at 137.) Moore-Bryce received frequent calls from Moore when Moore fought with appellant.

Columbus Police Detective Jay Fulton also testified on behalf of appellee. Detective Fulton and Columbus Police Detective John Weeks interviewed appellant on the day of the December 8, 2005 shooting. Appellee played a recording of the interview for the jury. In the interview, appellant made the following statements. Moore and appellant had been dating and shared a home. On December 8, 2005, appellant and Moore were arguing while at the house of a friend, Todd Dowell. They had been drinking. Moore and appellant returned home.

The interview then depicted the following.

[APPELLANT]: * * * And me and her had been arguing and to make a long story short I was cussing at her and she went in my closet. I'm laying down with my kids at the time. I'm laying down with my daughter, my youngest daughter, and she grabs the gun.

* * *

All the kids are laying down in the bed with me. And [Moore is] on the phone with her mom and you know, because we had been arguing and I'd been cussing at her.

3

DETECTIVE FULTON: What were you arguing about?

[APPELLANT]: * * * [J]ust stupid stuff. I mean, * * * I said we was gonna split up and, you know, she was taking the split-up * * * rough or whatever. And she was just cussing me up to her parents. And I was just calling her bitches and stuff like that. And you know, next thing I know she went in my closet.

DETECTIVE FULTON: Did it ever get physical * * *[?]

[APPELLANT]: It did. She punched me in the eye right here. And the police came out yesterday. I didn't press charges against her. And today she had, you know, went for my gun. And you know, me and her had fought before. She got it out of the case. I didn't believe she was really gonna take it out of the case. * * *

* * *

[APPELLANT]: * * * I was wrestling to get the gun out of her hand and it goes off. She grabbed the gun and-

* * *

[APPELLANT]: * * * So when she gets it out of the case, you know, I jump up out the bed.

* * *

She standing to the left of the bed. I guess if I'm laying on the bed facing the wall she's standing to the left of the bed. So when I rush her to get the gun, me and her are fighting for the gun and then in the confusion, I don't know, the rest there is crazy. I'm trying to take the gun away from her, it's between me and her. * * * I never meant.

DETECTIVE FULTON: Never meant what?

[APPELLANT]: For the swing between us, the swing to her. I tried to take it out of her hands all the way. * * * I should have stopped her when I seen her grabbing it.* * *

4

* * *

She had [the gun] in her right [hand] and then we started grappling for it.

* * *

DETECTIVE FULTON: * * * Was she going to hurt herself, was she going to hurt you, was she going to hurt the kids, was she trying to make a point[?]

[APPELLANT]: Sir, I said she's probably trying to make a point. But the point that she was trying to make I grappled for the gun because my kids and me were laying in bed. I wasn't trying to, you know, sit around and watch her wave a gun around to make a point. I was grappling for the gun.

DETECTIVE FULTON: Where did you grab the gun?

[APPELLANT]: Probably right around the handle part. The handle part and everything and just like fighting, you know, saying for position and grabbing it.

* * *

DETECTIVE FULTON: * * * [D]escribe to us as she was taking the gun out of the case?

[APPELLANT]: She took it out the case and everything and she had it in her hands. But I don't-past that I don't know. I'm laying in bed with my daughter when I seen her doing that.

DETECTIVE FULTON: How far along did she get before you jump up and go to action?

[APPELLANT]: She got the gun all the way out before I got in action.

* * *

* * * I tried to * * * grapple with the gun and get in front of her

5

and it went off. * * *

* * *

DETECTIVE WEEKS: It sounds to me what you're saying she's prone to violence.

[APPELLANT]: Yes.

* * *

* * * She's got knives before and came at me.

* * *

DETECTIVE FULTON: So you start smacking one another around?

[APPELLANT]: No. I never touched her. Outside of getting my child undressed she's like you're not shit and I was like well bitch, f--- you. And she was like well you're not shit. I can't believe I'm with you. Well bitch, f--- you. And I got the kids undressed. I feel uncomfortable arguing in front of my kids. So we all laid down and she gets on the phone and she's like da, da, da.

* * *

* * * I didn't jump up off the bed until I seen that she had the audacity to pull it out of the gun case to try to grab it.

* * *

DETECTIVE WEEKS: How many gunshots were fired?

[APPELLANT]: One. That's all.

* * *

6

DETECTIVE WEEKS: Okay. And when the gun discharges and she falls to the ground, to the floor, who's got the gun in their hand?

[APPELLANT]: Me.

DETECTIVE WEEKS: You're left holding the gun?

[APPELLANT]: Yes. From wrestling. Yes.

DETECTIVE WEEKS: What do you do with the gun after she had fallen to the floor?

[APPELLANT]: Dropped it immediately because I wrestled it out.

(Vol. III Tr. at 204-208, 212-213, 215, 218-221, 224-227.)

Mark Hardy of the Columbus Police Crime Lab tested the firearm used during the December 8, 2005 shooting incident. Hardy testified that the firearm could not be fired any other way than through the application of pressure on the trigger; there was nothing about the firearm that made "it more likely than others to go off unintentionally." (Vol. IV Tr. at 34.)

Hardy also tested soot on the sweater Moore was wearing and concluded that the sleeve of the sweater was "in contact with or close contact with the weapon at the time of discharge." (Vol. IV Tr. at 40.) Appellee showed Hardy a photograph of Moore's body after the shooting, and the photograph depicted "dark marks along the upper arm." (Vol. IV Tr. at 41.) Hardy testified that the marks in the photograph "could possibly be" "consistent with burns or soot deposits from close contact with the weapon firing." (Vol. IV Tr. at 41.) Hardy testified that the dark mark on Moore's body "correspond[s]" with the soot on the sweater, and, therefore, such results establish that "[t]hey would be in the same approximate location." (Vol. IV Tr. at 42.)

Appellee showed Hardy another photograph of Moore's body after the shooting, and the photograph depicted "a dark mark on the lower left arm." (Vol. IV Tr. at 43.) Hardy testified that

7

the mark "could possibly be" "consistent with either the burns or soot deposition in close contact with a weapon firing." (Vol. IV Tr. at 43.)

Next, appellee showed Hardy a photograph that depicted "a dark mark on the side" of Moore's head. Hardy testified that the mark was "consistent with soot deposition from contact or close contact with the discharge of a firearm." (Vol. IV Tr. at 43.)

Thereafter, appellee asked Hardy: "How close * * * would the sweater have been to [appellant's] head wound?" (Vol. IV Tr. at 47.) Hardy responded:

Given the fact that one shot was fired, the weapon was in contact with or loose contact with the head at the time of discharge, assuming that the blue turtleneck and arm was folded at the time which would allow soot deposition in two places on the lower left arm and the mid arm of the left sleeve, the arm would have had to have been fairly close to the head at the time of discharge. Assuming * * * the residue on the arm is from the muzzle, the arm would have had to have been fairly close to the head because the muzzle was fairly close to the head. If we assume the soot has come from the cylinder gap then it would have been a little farther away from the head but still fairly close.

(Vol. IV Tr. at 47.)

The trial court then asked Hardy to approximate distances, and Hardy testified:

The head wound I would say is most likely less than an inch in contact or loose contact so it's less than an inch. So we've got a weapon here near the head in contact with the head or very close contact with the head. If these came from the muzzle of the weapon then the arm would almost would have to have had been in contact with the head or close contact. If the soot deposition on the sleeve came from the cylinder area of the weapon because we're talking about an approximately four inch barrel then it would be approximately three and a half,

8

four inches away, somewhere in that area.

(Vol. IV Tr. at 48.)

Dr. William Cox from the Franklin County Coroner's Office did an autopsy on Moore. Dr. Cox testified that he is a forensic pathologist and, in that capacity, determines, in part, the manner in which people die. Dr. Cox testified that Moore died from a gunshot wound to the head. Dr. Cox testified that "[t]he manner of death was homicide" and that the bullet entered the left side of Moore's head. (Vol. IV Tr. at 96.) Dr. Cox also testified as follows:

Q. Was there anything * * * that the soot pattern [on Moore] was able to tell you about with regard to distance?

A. Okay. First you know it's not hard contact. Now, hard contact means the muzzle of the weapon is placed right against the skin. The reason you know that, it didn't have black searing at the margins and it didn't have stellae tears. Because when that missile exits in that kind of configuration, the gases that are discharged go directly underneath the skin, expand the skin and you get these linear tears at the edge of the gunshot wound. We know that never transpired.

We also know that there was no powder stippling. Powdered stippling is produced by the unburned powder grains which is what gives the missile its energy to move forward out of the barrel. And what they are are tiny pinpoint areas of abrasion. They have a reddish to reddish orange color. You can see those somewhere beyond ten millimeters which is about .04 inches. I believe that's about right. From the surface of the skin out to a point that varies.

It depends on who you read, but out to a point of 12 to 18 inches from the surface of the skin. And obviously as the end of the muzzle gets further and further away, the pattern, the stippling pattern gets greater and greater in diameter until it finally disappears. So we didn't see that.

9

So what we know for certain here based upon the soot pattern, no powder tattooing. You know it was ten millimeters or under. * * *

* * *

Q. Going back to now the two marks on [Moore's] arm. Was there anything significant or was there any reason that they drew your attention?

* * *

[A.] * * * [W]hen the missile is discharged not only does soot come out at the end of the muzzle, but assuming this is the cylinder and this is the barrel, this is cylinder and this is the barrel, it comes out here. And what that told me is that when the deceased was-when the deceased was shot in some fashion the arm had to be up like this because that soot pattern is deposited almost in a V shape, in a linear V. * * *

* * *

* * * We call those defensive injuries. In other words, what the individual is doing is they're raising their arm up to ward off the bullets that are coming at them, the missiles that are coming at them, * * * they'll put their arm up trying to ward off the blows and the subwounds.

* * *

Q. What, if anything, makes this or your findings inconsistent with a self-inflicted wound?

A. It was my understanding that the deceased * * * was right handed. * * *

* * *

* * * I had a hard time grasping how an individual could contort themselves with being right handed and getting a near

10

contact wound in the angle that we were getting and at the same time putting a soot like pattern on their left forearm, both the left forearm and the left arm. It just no matter-is it possible? I suppose it would be remotely possible. But is it probable, does it make common sense? The answer to that was no.

Q. And Dr. Cox, is there anything about the body, and again, talking about the arm either being nearly in front of the face as you demonstrated or folded, is there anything about if the deceased had the weapon in her right hand?

A. Yes.

Q. Is there anything about the anatomy of the body that would make it difficult to get that arm around?

A. If you stop and look at it, it just-just think that you got it, you know, basically you m[u]st have to be a contortionist to accomplish that kind of gunshot wound. The other thing please keep in mind is the abundant blood, et cetera, that you find on the left hand both this side and this side and the left forearm. When a head wound takes place, they bleed a great deal. What you would anticipate is that the blood would be, if the person is right handed, discharge the weapon you expect almost like a blow-back effect where it would come back onto the right hand both either the anterior surface or the dorsal surface and that was not the case here.

* * *

(Vol. IV Tr. at 88-95.)

On cross-examination, Dr. Cox testified that Moore had an alcohol level of .18 at the time of her death, and she was "under the influence of alcohol." (Vol. V Tr. at 8.) Dr. Cox also testified that alcohol "release[s] * * * inhibitions" that "allow emotions to be carried away." (Vol. IV Tr. at 113.) In addition, Dr. Cox testified that severe mental illness could "be a fact of consequence." (Vol. IV Tr. at 114.)

Next, appellee rested its case-in-chief. Thereafter, the following

11

exchange took place between appellant's counsel and the trial court:

MR. OWEN: You know Judge, I've always made a Rule 29 motion and I'm not sure I'm going to do it here. But-

THE COURT: I'll tell you what, I mean, in anticipation of the motion I certainly thought about it and I certainly think that viewing this in the light most favorable to the nonmoving party, there certainly is a jury question there.

MR. OWEN: That's my view. So I've-not that I think it's a good question, but I think it's a question.

THE COURT: But it's still a question. All right.

(Vol. V Tr. at 25-26.)

Dr. Martin Ryan, a psychiatrist, testified on behalf of appellant. Dr. Ryan testified that Moore had been diagnosed with having bipolar disorder and polysubstance dependence, and, after reviewing Moore's medical records, Dr. Ryan agrees with such diagnosis. Dr. Ryan testified that:

Bipolar disorder is a persistent and severe mental illness. It's not just mood swings. It is an incurable brain illness. And it's characterized by mood episodes. Those mood episodes have to at least include a manic episode and a mixed episode and usually also include depressive episodes.

* * *

And a manic episode is a period of time that's at least a week when someone has a grandiose or an irritable mood and also must have certain other characteristics. They have to have four of a list of about seven or eight characteristics to qualify. These include racing thoughts, physical agitation or what we call psychomotor agitation, pressured speech, being argumentative, being hard to quiet down, decreased sleep. Those are some of the characteristics of a manic episode.

12

(Vol. V Tr. at 38-40.)

Dr. Ryan also testified that "[t]ypically bipolar illness when you're in a manic episode, a mixed episode or a depressive episode would impair judgment." (Vol. V Tr. at 42.) Furthermore, Dr. Ryan testified that the bipolar illness:

* * * [M]akes it harder for the person to cope with stress because by definition in a manic episode they're irritable or grandiose. They have to have that in order to be in a manic episode. And that makes it harder for them to make judgments of what's appropriate to do in a response to stress. Also these are people who are not sleeping well. That's also a definition of a manic episode. They're getting very little or no sleep which impairs their ability to cope with stress.

(Vol. V Tr. at 43.)

Moreover, Dr. Ryan testified that a person with bipolar illness "is at higher risk of violence to themselves by suicidal acts or careless acts and injure themselves. And also violence to others." (Vol. V Tr. at 44.) Dr. Ryan testified that, in reviewing Moore's medical records and in particular a standardized test she took while being treated for the bipolar illness, he noticed that Moore "scored in the 96th percentile, meaning that 96 percent of people taking the test scored lower than she did in violence, 97 percent in judgment problems and 93 percent in coping problems." (Vol. V Tr. at 63.)

In addition, Dr. Ryan verified that Moore had been prescribed medication for her mental illness. Dr. Ryan surmised that Moore was responding well to the treatment, given that she had told one of her doctors that after starting the treatment she was not as depressed, irritable or "so quick to snap" as before. (Vol. V Tr. at 58.) Dr. Ryan also testified that Moore's last order for such medication was made on May 14, 2005.

Lastly, appellant's counsel asked Dr. Ryan the following hypothetical:

Q. * * * I want you to assume that a person with the medical

13

diagnosis and the medical history that's the same as you examined through Tamara Moore's records was prescribed medication and that commencing no later than September 1st of 2005 that person ceased taking their prescribed medication. And I want you to assume that the medication prescribed was the same that you observed in Tamara Moore's records.

I want you to assume that in the month of November that person had one or more assaultive episodes of punching a neighbor. I want you to assume that that person was-and that that occurred in mid to late November. I want you to assume that that person had periods where they were-had excessive motor activity, by that I mean pacing or jumping up and down.

I want you to assume that during period from-that in December 1st that person moved. I want you to assume that from the period from the 1st of December through 9:00 p.m. on December 7th-I'm sorry, 9:30 p.m. on December 7th that that person was observed jumping, yelling, screaming, pacing. During that period on at least one occasion punched someone in the face and that in the evening hours of-and by evening I mean between 7:00 p.m. and 9:30 p.m. on December 7th when they were leaving a friend's house was seen literally jumping up and down.

* * *

Q. And would you have [an] opinion as to whether that person was in any one of the states of bipolar medical illness?

A. Yes.

* * *

Q. And what is that opinion, Dr. Ryan?

A. My opinion is in that hypothetical case that the person that you described would be in a manic or a mixed state.

* * *

14

Q. And what effect does it have on the behavior?

A. Those states are characterized by poor judgment, not sleeping very much, feeling irritable, often talking very quickly, having what we would call pressured speech. Sometimes being grandiose, self-important, infallible.

* * *

A. Someone in a mixed or a manic state is more likely to be violent either to themselves or to others.

(Vol. V Tr. at 67-68, 80-81.)

Todd Dowell testified as follows on behalf of appellant. Dowell befriended appellant and Moore, and, on the evening of December 7, 2005, at Dowell's home, Dowell socialized with appellant, Moore, and a man named Darryl who accompanied Moore and appellant. The group was drinking alcohol and, during the evening, appellant and Moore began to argue. One issue was appellant wanting to get back together with his wife, Angel Profitt, with whom he had separated. In an effort to diffuse the situation, Dowell took appellant and Darryl out for a drink. When appellant, Darryl, and Dowell returned to Dowell's home, appellant and Moore argued again. During the argument, Moore was acting in a "very aggressive" manner. (Vol. VI Tr. at 23.) She was pacing, stomping, and swearing. She stated: "I can't stand [appellant]. * * * I could kill him." (Vol. VI Tr. at 24.) Indeed, throughout the evening, Moore used the word "kill" "at least nine or ten times." (Vol. VI Tr. at 25.)

Ultimately, appellant and Moore went home. Thereafter, around 11:45 p.m. on the evening of December 7, 2005, Moore called Dowell's residence. Dowell and his wife were in bed, and Dowell placed the call on the speaker phone. During the phone call, Moore was "flipping out" about appellant wanting to get back together with Angel Profitt. (Vol. VI Tr. at 42.) Moore also yelled at appellant, stating: "I hate you, I could just kill you." (Vol. VI Tr. at 42.)

After Moore ended her phone call, Dowell called appellant. It

15

was then after midnight. Dowell "was worried and * * * afraid that something was going to get out of hand." (Vol. VI Tr. at 45.) Dowell had "heard [Moore] threaten [appellant] all night long and [Dowell] just didn't know how long [appellant] was going to be able to take it before they just start[ed] going back and forth." (Vol. VI Tr. at 45.) During the phone call, Dowell told appellant to just go to sleep. Meanwhile, Moore was in the background threatening appellant and stating that "if these kids was not in this house I will kill you." (Vol. VI Tr. at 47.) Appellant was not threatening Moore. Dowell also stated:

Then [appellant says] * * * [s]he's going in my lock box getting my gun. I said [appellant] go to bed, just ignore her. [Appellant says that Moore is] standing by the bedroom door okay she's going through trying to get my gun out my * * * lock box. She got my gun. I was like [appellant], do not get up. * * *

* * *

[Appellant] was like I can't. She's over here waving a gun at me. * * *

* * *

[Appellant then said] hold on man, I got to get up.

(Vol. VI Tr. at 50-51.)

Thereafter, Dowell heard a scuffle and then a gunshot. Appellant came back on the phone and acted hysterically and was crying. Appellant stated that Moore "shot herself." (Vol. VI Tr. at 52.) Dowell told appellant to call 911.

Appellant testified as follows on his own behalf. Appellant had been married to Angel Profitt, and appellant and Profitt have three children. Appellant has no other children. In May 2005, appellant and Profitt decided to separate. Appellant met Moore around June 1, 2005, and, in August 2005, appellant and Moore rented an apartment together. Appellant knew that Moore was taking prescription medication for her bipolar mental illness. Moore had medication from a May prescription,

16

but was unable to get the prescription re-filled.

In November 2005, appellant and Moore were evicted from their apartment. In the weeks following the eviction, appellant noticed that Moore got agitated easily. On one occasion, she kicked a hole in the wall, on another, she kicked the bathroom door open.

When appellant and Moore moved into a new apartment, they argued "over little stuff" every day. (Vol. VI Tr. at 103.) Likewise, appellant noticed that Moore was not sleeping well; she would be awake and watching television around 3 a.m.

On December 5, 2005, Moore hit appellant and, the next day, came after appellant with a knife. On December 7, 2005, appellant, Moore, and appellant's cousin, Darryl, drove to Dowell's house. Appellant dropped Moore and Darryl off at Dowell's house, and appellant went to pick up his children. Appellant was going to bring his children to Dowell's house.

When appellant returned to Dowell's house, Moore and appellant started to argue, and Dowell took appellant and Darryl out for a drink. When Dowell, appellant, and Darryl returned, appellant and Moore continued to argue. Moore stated to appellant: "I can't stand you. If your kids wasn't here I'd kill you." (Vol. VI Tr. at 127.) Moore was "jumping up and down" and screaming and swearing. (Vol. VI Tr. at 128.)

Ultimately, appellant, Moore, and appellant's children left for home. Upon returning home, Moore and appellant continued to argue. Appellant left to go to his mother's house, but his mother was not home. Appellant returned home and went to bed. He brought his children to his bed, too. Meanwhile, Moore was on the phone "cussing [appellant] up and down the wall" and making threats against appellant. (Vol. VI Tr. at 130.)

After midnight on December 8, 2005, Dowell called. As to what occurred while he was on the phone with Dowell, appellant testified, as follows:

A. [Moore] just continued, you know, being argumentative,

pacing in and out the room, you know, blurting cuss words at me. I'm trying to, you know, talk to [Dowell]. He's trying to keep me calm because a couple of times I'm responding to a couple of the things she's saying to me which is I guess is making her, you know, angrier.

* * *

Q. * * * [D]uring that call was * * * [Moore] threatening you? A. Yes, she was.

Q. And during that time did you see her go into the bedroom closet?

A. I seen her pacing in and out the room. I seen her walk over by the closet out, but yes.

Q. And did you see her subsequently go out the doorway?

A. Yes, I did.

Q. And was she threatening to kill you in front of * * * your kids?

A. Yes.

* * *

Q. How did she threaten to kill you in front of your kids?

A. I mean, verbally to the point where I seen her, you know-it was just verbal until I noticed she was at the foot of the bed standing with the gun pointed at me and I'm on the bed laying using my youngest daughter kind of like a pillow on the phone with [Dowell]. Up to that point it was verbal until I fully acknowledged it right there.

Q. At that time, [Dowell], did you know where the gun was located?

18

A. Yes.

Q. Where was it stored?

A. It was stored in the closet.

Q. * * * Now, when you saw her with the gun do you recall where she was when you first saw her, do you recall whether she was by the closet or do you recall whether she was by the one in the hall?

A. When I saw her with it out she was standing by the foot of the bed.

* * *

I was more so just like shocked more than anything. I'm like here she is * * * playing with the gun. I got up to basically just try to like grab her wrist to turn it up or and then when I did that and pushed her back, you know, she fell slipping over the bed and I fell forward with her and that's when it went off. You know, I twisted her wrist, you know, so it was in between us, you know, like I was stating and then when I had pushed her back, you know, she fell over the bed, I fell forward with her and it went off so fast, you know, I thought it hit the wall. You know, I immediately let go, finished falling with her, you know. One hand went on the bed, the other on the floor.

(Vol. VI Tr. at 133-137.)

Next, appellant testified as follows:

Q. When you saw [Moore] at the foot of the bed with the gun, how was she holding it, if you recall?

A. She was holding it with one hand with her right hand just pointed at me.

Q. And did she ever change positions?

A. I mean, yeah, she did. She grabbed it with two hands saying

19

what if I do this. That's after I got up, of course, and was walking like give me the gun.

* * *

Q. So when [Moore] said to you what if I do this, did she then put it from one hand into two hands?

A. Yes.

Q. And at that point, if you recall, was the gun cocked?

A. To tell you the truth I don't know if it was or not. I wasn't paying too much attention, you know, to if it was cocked or not. * * *

* * *

Q. * * * And when [Moore] had her hand-both hands on the gun, what did you do?

A. * * * I wanted to turn her hand up so she'd drop it and put pain on her. When I pushed her back, she tried to pull it back. Pushed her, I wanted her to drop. She fell over the bed, I fell forward with her. That's when it went off. I just let go. We both fell though. I twisted her wrist up like this and pushed her. When she fell, she fell backwards over the bed. I fell forward with her. It went off and from there I let go of her hand.

* * *

Q. * * * How did you know that she went into the closet to get the gun?

A. One, I seen her go in the closet. You know, two, that's where I kept it. * * * So yeah, I seen her grab it and walk out.

* * *

* * *

20

Q. You state [in your recorded interview with police] when she gets [the gun] out of the case [you] jump out of the bed and rush her. Was that true?

A. Yes. After she gets it out.

* * *

Q. Did you expect any way that that gun would go off?

A. No. None.

Q. And up until the time that gun went off-from the time you saw the gun until the gun went off, what was your purpose?

A. My purpose was just to make sure that, you know, my kids was safe first off, to get the gun and just basically put it up. You know, make sure my kids was safe.

Q. Was there any intention on your part for that gun to be fired?

A. No.

* * *

Q. Then the detective says well, you described to us how she was taking the gun out of the case and you answered she took it out of the case and everything and she had it in her hands, but past that I don't know. I was lying in bed with my daughter when I seeing her doing that. Why did you say that?

A. Because I didn't know what she had done with the gun case. I had seen her come in the room, I seen her go out the room. I didn't know exactly when she grabbed it. I just seen her walk in the area. I didn't know that she, you know, had it until I seen her at the foot of the bed. So I just assumed that she had to go and get it out the gun case because that's where I kept it.

(Vol. VI Tr. at 141-143, 153-154, 156, 159-160.)

21

On cross-examination, appellant testified:

Q. * * * [Y]ou told the detectives that as soon as you saw her getting the case you jumped up out of bed; correct?

A. Yes. But what I was thinking, you know, I didn't see her grab the case per se. I knew she had the gun because she was standing there at the foot of my bed. I knew that she had to get the gun out the closet because that's where I kept my gun case. I seen her walk in and out. I thought she had went to the bathroom. So evidently she must have grabbed it out of my closet, walked out there, you know, something because when I seen her in there, you know, she was just standing right there at the foot of my bed with it. And she's cussing at me. I was on the phone. I wasn't trying to pay her no attention. I was trying to ignore her and talk on the phone.

(Vol. VI Tr. at 194.)

During closing argument, appellant's counsel reminded the jury how "combative [Moore] was" and that "she was getting more and more violent." (Vol. VII Tr. at 52.) Appellant's counsel then argued:

* * * [W]hen you look at all the evidence you can't have a reasonable doubt as to what his purpose was that night. You can't. You can't. There is no way. No way that they have met their burden that he acted or did anything with the intent to cause [Moore's] death. Pure and simple it was a tragic accident. And the appropriate verdict is not guilty. * * *

(Vol. VII Tr. at 52-53.)

Before the jury deliberated, the trial court provided the following jury instructions:

* * * [Appellant] must be acquitted of this offense unless the State produces evidence which convinces you beyond a reasonable doubt of every essential element of the offense[s].

* * *

22

[Appellant] is charged with murder in the indictment. Before you can find [appellant] guilty of murder you must find that the State of Ohio has proved beyond a reasonable doubt that on or about the 8th day of December, 2005 and in Franklin County, Ohio [appellant] purposely caused the death of Tamara Moore.

* * *

A person acts purposely when it is his specific intention to cause a certain result. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. It must be established in this case that at the time in question there was present in the mind of [appellant] a specific intention to cause the death of Tamara Moore.

I used the word cause, as in cause the death. Cause is an act or failure to act which in a natural and continuous sequence directly produced the death and without which it would not have occurred.

* * *

Now, if you find that the State failed to prove beyond a reasonable doubt any of the elements of murder you will find [appellant] not guilty of the offense of murder and you will then consider the lesser offense of reckless homicide.

Before you can find [appellant] guilty of reckless homicide you must find beyond a reasonable doubt that on or about the 8th day of December, 2005 and in Franklin County, Ohio [appellant] recklessly caused the death of Tamara Moore.

* * * A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result. Risk means a significant possibility as contrasted with a remote possibility that a certain result may occur.

23

I've already defined the word cause for you and that definition applies equally here.

(Vol. VII Tr. at 76, 82-83, 85-86.)

During deliberation, the jury asked for a definition of "recklessness" in "plain terms." (Vol. VII Tr. at 142.) The trial court gave the following answer:

*** To assist in understanding the legal definition of recklessly given to you, please consider the following which should be considered with the definition already provided you in the jury instructions.

A person is said to be reckless when without caring about the consequences he obstinately or perversely disregards a known and significant possibility that his conduct is likely to cause a certain result. ***

(Vol. VII Tr. at 142-143.)

Ultimately, the jury found appellant not guilty of murder, but guilty of reckless homicide with an accompanying firearm specification. Thereafter, on February 1, 2007, appellant's counsel filed a Crim.R. 29© motion for acquittal. The trial court did not expressly rule on the Crim.R. 29© motion, but, rather, the trial court proceeded to sentence appellant to a total of eight years imprisonment. The trial court first sentenced appellant to five years imprisonment for the reckless homicide conviction. The five-year prison sentence constituted the maximum authorized prison sentence for the third-degree felony. See R.C. 2929.14(A)(3). Pursuant to R.C. 2941.145 and 2929.14(D)(1)(a)(ii), the trial court sentenced appellant to an additional mandatory three years imprisonment on the firearm specification.

*State v. Martin*, No. 07AP-362, 2007 WL 4564409 * 1-*13(Ohio App. 10th Dist. Dec. 31, 2007).

Petitioner filed a timely appeal, in which he asserted the following assignments of error:

[1.] The court committed plain error by failing to include an

instruction on accident in the jury instructions.

[2.] The court committed plain error by not instructing the jury regarding when the use of non deadly force is justified either in self-defense or in the defense of others.

[3.] The evidence was legally insufficient to establish appellant recklessly caused the death of another.

[4.] The evidence was legally insufficient to support conviction on the firearm specification.

[5.] Counsel's omissions with regard to instructions, and the failure to seek acquittal on the principal charge at the close of the state's case denied appellant his Sixth Amendment and Article I, Section 10 right to the effective assistance of counsel.

[6.] Appellant's convictions were against the manifest weight of the evidence.

[7.] The court erroneously imposed a sentence in excess of the statutory minimum for an offender who had not previously served time in prison.

*Id.* at *13. On December 31, 2007, the appellate court affirmed the trial court's judgment.

*Id.* On May 7, 2008, the Ohio Supreme Court dismissed petitioner's subsequent appeal.

*State v. Martin*, 117 Ohio St.3d 1500 (2008).

Meanwhile, on March 14, 2008, petitioner filed an application to reopen his appeal pursuant to Ohio Appellate Rule 26(B). He asserted that he had been denied the effective assistance of appellate counsel because his attorney failed to timely contact trial counsel to determine whether there had been any off-the-record discussion of an accident instruction. *See State v. Martin*, 2008 WL 2588618 (Ohio App. 10th Dist. June 30, 2008). On June 30, 2008, the appellate court denied petitioner's Rule 26(B) application. *Id.* On October 15, 2008, the

25

Ohio Supreme Court dismissed petitioner's subsequent appeal.  *State v. Martin*, 119 Ohio St.3d 1489 (2008).

On November 14, 2008, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1.  Accident is a defense to the offense of reckless homicide. When there is evidence in support of the defense it is essential that an instruction on accident be included in the charge so that the jury may distinguish accident as a defense recognized under the criminal law from common usage where accident may encompass events that are the product of recklessness or negligence.  It is error on the Ohio Supreme Court's part to down play the importance of the accident instruction.
>
> 2.  The evidence was legally insufficient to establish petitioner recklessly caused the death of another.
>
> 3.  The evidence was legally insufficient to support conviction on firearm specifications.

It is the position of the respondent that petitioner's claims are procedurally defaulted or without merit.

## CLAIMS TWO AND THREE

In claims two and three, petitioner asserts that the evidence was constitutionally insufficient to sustain his convictions on reckless homicide with a firearm specification. The state appellate court rejected these claims in relevant part as follows:

> [A]ppellant contends that his conviction for reckless homicide with a firearm specification is based on insufficient evidence and is against the manifest weight of the evidence. We disagree.

Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52. We examine the evidence in the light most favorable to the state and conclude whether any rational trier of fact could have found that the state proved beyond a reasonable doubt the essential elements of the crime. *State v. Jenks* (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307; *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 78. We will not disturb the verdict unless we determine that reasonable minds could not arrive at the conclusion reached by the trier of fact. *Jenks* at 273. In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *See Jenks*, paragraph two of the syllabus; *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when reviewing a sufficiency of the evidence claim); *State v. Lockhart* (Aug. 7, 2001), Franklin App. No. 00AP-1138.

First, we address appellant's claim that his reckless homicide conviction is based on insufficient evidence. R.C. 2903.041 prescribes reckless homicide and states, in pertinent part, that "[n]o person shall recklessly cause the death of another ." Under R.C. 2901.22©:

> A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

Here, sufficient evidence established that appellant recklessly caused Moore's death. Initially, we recognize that Dr. Cox's testimony established that Moore died from the gunshot wound she sustained in the December 2005 shooting. Next, we

conclude that sufficient evidence established that appellant recklessly caused Moore's death during the shooting. In so concluding, we note that through appellant's own admissions to Detectives Fulton and Weeks, through results of the gunshot residue testing, and through Hardy's conclusions, the evidence established that the shooting occurred while appellant and Moore were very close to each other. Next, we note that Hardy testified that the firearm used in the shooting incident could not be fired any other way than through the application of pressure on the trigger. Thus, as Hardy testified, the gun was not "more likely than others to go off unintentionally." (Vol. IV Tr. at 34.) Considering this, we next note that Dr. Cox's testimony established the unlikelihood that Moore could have inflicted the wound upon herself. Again, Dr. Cox testified that "I had a hard time grasping how an individual [like Moore] could contort themselves with being right handed and getting a near contact wound in the angle that we were getting and at the same time putting a soot like pattern on their left forearm, both the left forearm and the left arm." (Vol. IV Tr. at 94.) Dr. Cox characterized the marks on Moore's left arm as "defensive injuries" that consist of an individual "raising their arm up to ward off the bullets that are coming at them." (Vol. IV Tr. at 92.) Next, we find it significant that appellant admitted during his interview with Detectives Fulton and Weeks that he had the gun in his hand when it "discharge [d] and [Moore fell] to the ground." (Vol. III Tr. at 227.) Given such evidence, and construing the evidence in a light most favorable to appellee, we conclude that the jury could have reasonably inferred that appellant gained sufficient control of the gun during the struggle to place pressure on the gun's trigger while in close proximity to Moore and "with heedless indifference to the consequences" and "perversely disregard[ing] a known risk that his conduct [was] likely to cause" Moore's death. (Vol. VII Tr. at 86.)

In so concluding, we recognize that appellant claimed he wanted to take the gun away from Moore to protect him and his children. However, we cannot say that appellant actually fired the gun in an act of self-defense or defense of another because appellant provided no evidence to support such a conclusion. *See State v. Cooper*, 170 Ohio App.3d 418,

2007-Ohio-1186, at ¶ 32 (recognizing that the defendant bears the burden to establish self-defense); *State v. Smith*, Franklin App. No. 01AP-848, 2002-Ohio-1479 (recognizing that the defendant bears the burden to establish the defense of another). Thus, we conclude that appellant's reckless homicide conviction was based on sufficient evidence.

In addition, appellant argues that his firearm specification conviction is based on insufficient evidence. Appellant was convicted of a firearm specification based on R.C. 2941.145, which applies when "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." Here, given our above conclusions, we also find that sufficient evidence allowed the jury to infer that appellant had control of the firearm when it was fired and, necessarily, that appellant used the firearm to commit the reckless homicide. Therefore, we conclude that appellant's firearm specification conviction was based on sufficient evidence.

\*\*\*

... [T]he jury had forensic evidence and expert testimony that allowed it to reasonably infer not that Moore sustained fatal wounds from a gun that accidentally fired, but from appellant gaining sufficient control of the firearm to place pressure on its trigger and fire the gun while in close proximity to Moore. Thus, it was within the province of the jury to convict appellant of reckless homicide with a firearm specification.

*State v. Martin,* 2007 WL 4564409 at \*17- \*18.

The factual findings of the state appellate court are presumed to be correct.  28

U.S.C. § 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue

29

> made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As summarized by the United States Court of Appeals for the Sixth Circuit:

> The United States Supreme Court outlined the proper application of § 2254(d) in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To justify a grant of habeas relief under the "contrary to" clause, "a federal court must find a violation of law clearly established by holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision." *Miller [v. Francis]*, 269 F.3d 609 [,] 614 [(6ᵗʰ Cir. 2001)](internal quotations omitted) (citing *Williams*, 529 U.S. at 413, 120 S.Ct. 1495). Under the "unreasonable application" clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

> case." *Id*. at 614 (quoting *Williams,* 529 U.S. at 412, 120 S.Ct. 1495). Even if a federal court could determine that a state court incorrectly applied federal law, the court still could not grant relief unless it also finds that the state court ruling was unreasonable. *Simpson v. Jones*, 238 F.3d 399, 405 (6th Cir. 2000).

*Cristini v. McKee*, 526 F.3d 888, 897 (6ᵗʰ Cir. 2008). Petitioner has failed to meet this standard here.

Before a criminal defendant may be convicted consistent with the United States Constitution, the record must contain sufficient evidence to justify a reasonable trier of fact to find that he or she is guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). To determine whether the evidence was sufficient to support a conviction, this Court must view the evidence in the light most favorable to the prosecution. *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, at 319.)  The prosecution is not affirmatively required to " 'rule out every hypothesis except that of guilt.' " *Id*. (quoting *Jackson*, at 326). " '[A] reviewing court 'faced with a record that supports conflicting inferences must presume – even if it does not appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *Id*. (*quoting Jackson*, at 326).

As discussed by the state appellate court, prosecution witnesses testified that physical evidence indicated it would have been unlikely that Moore could have caused the fatal wound to her head.  It appeared that she had been raising her arm up in a defensive manner at the time she was shot in an attempt to ward off bullets.  Petitioner told police he had been holding the gun when it discharged and Moore fell.  The gun could only be fired

by application of pressure on the trigger.  For these reasons, and for the reasons detailed by the state appellate court, this Court agrees that, viewing all of this evidence in the light most favorable to the prosecution, the evidence was constitutionally sufficient to sustain petitioner's convictions on reckless homicide with a firearm specification.

Claims two and three are without merit.

## CLAIM ONE

In claim one Petitioner asserts that he was denied a fair trial when the trial court denied his request for a jury instruction on the defense of accident.  Respondent contends that this claim is procedurally defaulted because petitioner failed to raise the issue at trial. Because the petitioner failed to object, the state appellate court reviewed the claim regarding the jury instruction for plain error.  The court analyzed the issue as follows:

> [A]ppellant contends that the trial court committed plain error by not providing a jury instruction on the defense of accident. We disagree.
>
> "The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder." *State v. Joy*, 74 Ohio St.3d 178, 181, 1995-Ohio-259, citing *State v. Comen* (1990), 50 Ohio St.3d 206, paragraph two of the syllabus. Here, appellant claims that he was entitled to a jury instruction on the defense of accident.
>
> When a defendant raises the defense of accident, " 'the defendant denies any intent * * *. He denies that he committed an unlawful act and says that the result is accidental.' " *State v. Poole* (1973), 33 Ohio St.2d 18, 20, quoting 4 Ohio Jury Instructions (1970) 177, Section 411.01. The defense of accident is "tantamount to a denial that an unlawful act was committed; it is not a justification for the defendant's admitted conduct. * * * Accident is an argument that supports a conclusion that the

state has failed to prove the intent element of the crime beyond a reasonable doubt." *State v. Atterberry* (1997), 119 Ohio App.3d 443, 447.

Here, appellant maintained that Moore's death resulted from an accidental shooting, and appellant's counsel argued that Moore died through a "tragic accident" resulting from a struggle with a gun. (Vol. VII Tr. at 53.) However, appellant's counsel did not request a jury instruction on the accident defense, and appellant's counsel did not object to the trial court's omission of such an instruction. Absent plain error, a party forfeits error concerning jury instructions if the party fails to object before the jury retires. *State v. Jackson*, 92 Ohio St.3d 436, 444, 2001-Ohio-1266.

According to the plain error doctrine, enunciated in Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68. Under the plain error standard:

> * * * First, there must be an error, i.e., a deviation from a legal rule. * * * *United States v. Olano* (1993), 507 U.S. 725, 732 * * * (interpreting Crim.R. 52[B]'s identical federal counterpart, Fed.R.Crim.P. 52[b] ). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * [S]ee, also, *Olano,* 507 U.S. at 734 * * * (a plain error under Fed.R.Crim.P. 52[b] is " 'clear' or, equivalently, 'obvious' " under current law). Third, the error must have affected "substantial rights." We have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. * * *

*Barnes* at 27.

Our recognition of plain error, however, is discretionary. *See id.* Indeed, the Ohio Supreme Court has "admonish[ed] courts to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Id.,* quoting *State v. Long* (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.

We have previously held:

> Generally, although a trial court errs by failing to provide a jury instruction on the accident defense when the facts of a case warrant such an instruction, " 'if the trial court's general charge was otherwise correct, it is doubtful that this error of omission would ever satisfy the [test] for plain error' " by affecting the outcome of the trial. *See State v. Smith* (May 10, 1996), Miami App. No. 95-CA-17, quoting *State v. Stubblefield* (Feb. 13, 1991), Hamilton App. No. C-890597; *State v. Thomas* (Aug. 29, 1997), Hamilton App. No. C960242 (" *Thomas* "). Such is the case "[b]ecause the accident defense is not an excuse or justification for the admitted act," and the effect of such an instruction "would simply * * * remind the jury that the defendant presented evidence to negate the" requisite mental element * * *. *Smith; Thomas.* In this regard, "[i]f the jury had credited [the defendant's] argument, it would have been required to find [the defendant] not guilty * * * pursuant to the court's" general instructions. *See State v. Manbevers* (Sept. 28, 1994), Pickaway App. No. 93CA23.

*State v. Johnson,* Franklin App. No. 06AP-878, 2007-Ohio-2792, at ¶ 63.

Similarly, in *State v. Glagola,* Stark App. No.2003CA00006, 2003-Ohio-6018, at ¶ 26-27, the Fifth District Court of Appeals concluded that a trial court did not commit plain error by failing to provide an accident defense instruction on the

charges of murder and reckless homicide. The court noted that the trial court provided standard definitions of murder and reckless homicide. *Id.* at ¶ 26. Utilizing the plain error analysis, the appellate court concluded that the accident defense instruction would not have added anything to the general instruction. *Id.*; *but, see, State v. Howell* (2000), 137 Ohio App.3d 804, 813-815 (utilizing a harmless error analysis, the Eleventh District Court of Appeals reversed a defendant's convictions because the trial court failed to provide a requested accident defense instruction on a charge containing a reckless mental element).

Here, we need not recognize any plain error in regards to an accident instruction on the murder charge because the jury acquitted appellant of the murder charge. *See Barnes* at 27 (stating that we recognize plain error " 'only to prevent a manifest miscarriage of justice' "). In regards to the reckless homicide charge, we note that the trial court instructed the jury that appellee bore the burden of proof beyond a reasonable doubt on every essential element of reckless homicide, including the mental element of reckless. Moreover, in accordance with R.C. 2901.22(c), the trial court defined reckless as a perverse disregard or heedless indifference to the consequences. Such a definition "could easily allow jurors to understand that reckless conduct goes beyond what is considered to be an accident." *State v. Skeens* (Dec. 19, 2001), Noble App. No. 286, citing *State v. Tiber* (May 17, 1990), Belmont App. No. 88B28. Therefore, as in *Glagola,* and utilizing the plain error doctrine in harmony with Johnson, we conclude that an accident defense instruction would not have added anything to the general instruction in regards to appellant's reckless homicide charge. Accordingly, we hold that an accident defense jury instruction would not have affected the outcome of appellant's case, and the trial court did not commit plain error by not providing an accident defense jury instruction, and we overrule appellant's first assignment of error.

*State v. Martin*, 2007 WL 4564409 at *13 - *15.

In recognition of the equal obligation of the state courts to protect the constitutional

rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues, as it does here, that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground,

then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

The United States Court of Appeals for the Sixth Circuit has held that plain error review does not constitute a waiver of the state's procedural default rules. *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir.2000). As explained by the United States District Court for the Northern District of Ohio in *Adams v. Bradshaw,* 484 F.Supp.2d 753, 771 (N.D. Ohio 2007):

> Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley,* 380 F.3d 932, 968 (6th Cir. 2004), *cert. denied,* 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005) (citing *State v. Smith,* 89 Ohio St.3d 323, 332, 731 N.E.2d 645 (2000)). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.; Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Stojetz v. Ishee,* 2006 WL 328155 *12 (S.D. Ohio Feb.10, 2006).

> A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,* 380 F.3d at 968; *Hinkle,* 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle,* 271 F.3d at 244 (citing *Ylst, v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

*Id*. Because the state appellate court explicitly reviewed petitioner's claim for plain error only due to petitioner's failure to object, it therefore appears that Claim One is waived.

However, in Rule 26(B) proceedings, the appellate court stated that, despite its earlier review of petitioner's claim for plain error only due to petitioner's failure to object, because trial counsel had requested an instruction on the defense of accident, the claim in fact had been properly preserved for review. The appellate court rejected petitioner's claim of ineffective assistance of appellate counsel, however, concluding that his claim was, in any event, without merit. The state appellate court held in relevant part as follows:

> Pursuant to App.R. 26(B), defendant-appellant, Jacob L. Martin, Jr., has filed an application to reopen the appeal of *State v. Martin,* Franklin App. No. 07AP-362, 2007-Ohio-7152. Under App.R. 26(B), "[a] defendant in a criminal case may apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel." Plaintiff-appellee, the State of Ohio, opposes the motion.

> Appellant fatally shot Tamara Moore, and, in *Martin*, we affirmed his conviction for reckless homicide with a firearm specification for that shooting. *Id*. at ¶ 2, 78. Most important for our purposes here, we rejected appellant's argument that the trial court committed plain error by not providing a defense of accident jury instruction. *Id*. at ¶ 45. Appellant's brief applied a plain error standard to the error because the record gave no indication that appellant's trial counsel had objected to the court's omission of the accident instruction even though trial counsel argued that the shooting was an accident. *Id*. at ¶ 48.

> We concluded that the trial court did not commit plain error by failing to give the accident instruction. *Id*. at ¶ 48, 53....

> ***

We also rejected appellant's argument that trial counsel rendered ineffective assistance, in part, by failing to object to the trial court's failure to give an accident instruction. *Id.* at ¶ 70. We stated:

In [*State v. Johnson*, Franklin App. No. 06AP-878, 2007-Ohio-2792], we concluded that trial counsel did not render ineffective assistance by failing to request an accident defense instruction. *Id.* at ¶ 69. We noted that such an instruction would not have added anything to the instructions that the trial court did provide. *Id.* at ¶ 67-69. Here, like *Johnson*, we concluded above that an accident defense instruction would not have added anything to the instructions that the trial court did provide. Thus, like *Johnson*, we conclude that appellant's counsel did not render ineffective assistance by failing to request an accident defense instructions on the reckless homicide charge.

*Id.*

With the App.R. 26(B) application, appellant's appellate counsel has submitted an affidavit from trial counsel stating that, in an unrecorded in-chambers discussion about the jury instructions, trial counsel asked for an accident instruction, but the trial court refused. The affidavit also indicates that trial counsel did not submit the proposed accident instruction in written form.

Appellate counsel also submitted his own affidavit, which states that he did not speak with trial counsel when he prepared the appellate brief and was unaware of the in-chambers discussion. Appellate counsel did not learn of the discussion until after we decided the *Martin* appeal, and appellant's mother contacted trial counsel, who told her of the in-chambers request. In the App.R. 26(B) application, appellate counsel argues that he was ineffective for not timely contacting trial counsel to determine whether there had been any off-the-record discussion of an accident instruction. Had he been aware of the discussion, counsel argues, he would have sought to have the discussion made a part of the record through App.R. 9, and he would not have presented the

alleged error under the plain error standard on appeal. He also states that he would have argued that trial counsel was ineffective for failing to submit a written proposed accident instruction to the court and for then failing to object to the trial court's failure to give the instruction.

\*\*\*

The record before this court on appeal, as well as the record transmitted to the Supreme Court, contained no indication that trial counsel had requested an accident instruction. Appellant's current appellate counsel has explained, by affidavit, that he did not communicate with appellant's trial counsel about a possible accident defense instruction until after this court issued its decision, and appellant's mother contacted his trial counsel. Trial counsel confirms these events. Appellant has sufficiently explained the timing of the filing.

In *State v. Reed*, 74 Ohio St.3d 534, 660 N.E.2d 456, 1996-Ohio-21, the Supreme Court held that the two-prong analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard to assess a defense request for reopening pursuant to App.R. 26(B). Thus, a court reviewing an App.R. 26(B) application must determine whether appellate counsel was deficient for failing to raise the issues he now presents. We must also determine whether, if counsel had presented those claims on appeal, there was a reasonable probability that the result of the proceeding would have been different. The movant bears the burden of establishing that there was a genuine issue as to whether there was a colorable claim of ineffective assistance of counsel on appeal. *See State v. Spivey*, 84 Ohio St.3d 24, 701 N.E.2d 696, 1998-Ohio-704, *certiorari denied* (1999), 526 U.S. 1091, 119 S.Ct. 1506, 143 L.Ed.2d 658.

Appellate counsel first contends that he rendered ineffective assistance for not talking with trial counsel before filing the appellate brief because, had he timely learned about the in-chambers jury instruction discussion, he would not have raised this error on appeal using the plain error standard. As

we noted in *Martin*, "[a]bsent plain error, a party forfeits error concerning jury instructions if the party fails to object before the jury retires." *Id.* at ¶ 48, citing *State v. Jackson*, 92 Ohio St.3d 436, 444, 751 N.E.2d 946, 2001-Ohio-1266. Here, appellant's trial counsel did not expressly object to the trial court's failure to include an accident instruction, but did ask for the instruction during the in-chambers conference.

Crim.R. 30(A) governs jury instruction requests and states:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its instructions to the jury prior to counsel's arguments. The court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record.

In *State v. Wolons* (1989), 44 Ohio St.3d 64, 67, 541 N.E.2d 443, the Supreme Court, construing Crim.R. 30(A), held that, "in a criminal case, where the record affirmatively shows that a trial court has been fully apprised of the correct law governing a material issue in dispute, and the requesting party has been unsuccessful in obtaining the inclusion of that law in the trial court's charge to the jury, such party does not waive his objections to the court's charge by failing to formally object thereto." Applying *Wolons* here, because trial counsel informed the trial court of the need for an accident instruction, trial counsel did not forfeit error concerning the trial court's failure

41

to provide an accident instruction by the mere fact that trial counsel failed to formally object. We recognize that trial counsel did not submit the proposed accident instruction in writing, and Crim.R. 30(A) requires a party to propose a jury instruction in writing. Yet, in *State v. Williford* (1990), 49 Ohio St.3d 247, 252, 551 N.E.2d 1279, the Supreme Court held that, "where the trial court fails to give a complete or correct jury instruction on the elements of the offense charged and the defenses thereto which are raised by the evidence, the error is preserved for appeal when the defendant objects in accordance with the second paragraph of Crim.R. 30(A), whether or not there has been a proffer of written jury instructions in accordance with the first paragraph of Crim.R. 30(A)." Thus, considering *Wolons* with *Williford,* we conclude that trial counsel did not forfeit error under Crim.R. 30(A) by not submitting in writing the proposed accident instruction because trial counsel informed the trial court of the need to provide the instruction.

Accordingly, as appellant argues in the App.R. 26(B) application, the plain error standard did not apply to the trial court's failure to provide an accident instruction because trial counsel properly preserved the issue. Generally, if a defendant has preserved an error in the trial court, the appellate court reviews the error under the harmless error standard in Crim.R. 52(A). *State v. Perry*, 101 Ohio St.3d 118, 802 N.E.2d 643, 2004-Ohio-297, ¶ 15.

Crim.R. 52 defines harmless and plain error and states:

> (A) Harmless error

> Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded.

> (B) Plain error

> Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

Under the plain error standard, an appellate court has discretion to disregard an error, as long as the error did not affect a substantial right. *Perry,* 101 Ohio St.3d at ¶ 14, 800 N.E.2d 1117. However, the harmless error is " 'significantly more favorable to the defendant.' " *Id.* at ¶ 15, 800 N.E.2d 1117, quoting *United States v. Curbelo* (C.A.4, 2003), 343 F.3d 273, 286. Under the harmless error standard, the government must show that the error did not affect the substantial rights of the defendant. If the government does not make this showing, the appellate court has no discretion to disregard the error; rather, the court must reverse the conviction. *Perry* at ¶ 15.

In *Neder v. United States* (1999), 527 U.S. 1, 10-11, 119 S.Ct. 1827, 144 L.Ed.2d 35, the United States Supreme Court concluded that the harmless error doctrine applied to a trial court's failure to instruct the jury on an element of a charged offense because the error did not " 'vitiat[e] all the jury's findings.' " (Emphasis omitted.) *Id.* at 11, quoting *Sullivan v. Louisiana* (1993), 508 U.S. 275, 281, 113 S.Ct. 2078, 124 L.Ed.2d 182. The court contrasted its conclusions with its prior decision in *Sullivan.* In *Sullivan,* the United States Supreme Court deemed structural error a trial court's erroneous jury instruction on " 'reasonable doubt' " because the error "vitiates all the jury's findings." (Emphasis omitted.) *Id.* at 281. The court also noted that, with the erroneous "reasonable doubt" instruction, the court could "only engage in pure speculation-its view of what a reasonable jury would have done." *Id.*

Here, as in *Neder*, the failure to give an accident instruction did not "vitiate all the jury's findings." The instruction went only to the aspect of whether the jury had sufficient instruction on the defense of accident. There are circumstances where the jury receives instructions that sufficiently allow it to consider the accident defense even without the accident instruction. *State v. Tiber* (May 17, 1990), Belmont App. No. 88-B28. Moreover, unlike the situation in *Sullivan*, a reviewing court could infer whether, through the facts of the case, a defendant was prejudiced by the trial court's failure to provide an accident instruction. As an example, a reviewing court could infer that the trial court's failure to provide an accident instruction did not affect the defendant's substantial rights because the

43

strength of the evidence allowed the jury to reject the accident defense and convict the defendant. Therefore, we conclude that we must apply the harmless error doctrine to the trial court's decision to reject trial counsel's request for an accident instruction.

Applying the harmless error doctrine here, pursuant to Crim.R. 52(A), we must disregard errors that do not affect a defendant's substantial rights. The term "affect a defendant's substantial rights" means " 'that the error must have been prejudicial. It must have affected the outcome of the [trial] proceedings.' " (Emphasis omitted.) *State v. Fisher*, 99 Ohio St.3d 127, 789 N.E.2d 222, 2003-Ohio-2761, ¶ 7, quoting *United States v. Olano* (1993), 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508.

We held in *Martin* that the accident instruction did not affect the outcome of appellant's case and, thus, did not affect appellant's substantial rights, because the "accident defense instruction would not have added anything to the general instruction in regards to appellant's reckless homicide charge." *Id.* at ¶ 53. In particular, we noted that the trial court instructed the jury on the mental element of reckless as it pertains to the reckless homicide charge, and the reckless homicide charge " 'could easily allow jurors to understand that reckless conduct goes beyond what is considered to be an accident.' " *Id.*, quoting *State v. Skeens*, Noble App. No. 286, 2001-Ohio-3476, citing *Tiber.*

Although we made these determinations under the plain error analysis, *Perry* emphasizes that both the plain error and harmless error doctrines entail the same determination as to whether error affected a defendant's substantial rights. Given our conclusions in *Martin,* we deem harmless the trial court's failure to provide the requested accident instruction.

In addition, in *Martin,* we rejected appellant's argument that " '[t]he only reasonable conclusion [from the evidence] is that the gun fired accidentally as appellant struggled to take it away from Ms. Moore after an evening of erratic behavior, arguments, and death threats, all consistent with her mental illness .' " *Id.* at ¶ 67. We held:

44

> \* \* \* [T]he jury had forensic evidence and expert testimony that allowed it to reasonably infer not that Moore sustained fatal wounds from a gun that accidentally fired, but from appellant gaining sufficient control of the firearm to place pressure on its trigger and fire the gun while in close proximity to Moore. Thus, it was within the province of the jury to convict appellant of reckless homicide with a firearm specification. \* \* \*

*Id.*

This determination provides additional support for our conclusion that the trial court's failure to provide the requested accident instruction was harmless. Accordingly, we must disregard the error under Crim.R. 52(A). We conclude that the result of appellant's appeal would not have differed had appellate counsel applied the harmless error standard, and appellate counsel did not render ineffective assistance by not arguing that alleged error under the harmless error standard.

Lastly, appellate counsel argues that, had he timely learned about trial counsel's request for an accident instruction, he would have presented his ineffective assistance argument differently. Appellate counsel argues that, if he had talked with trial counsel, he would have argued that trial counsel was ineffective by not submitting the proposed accident instruction in writing and by failing to object to the absence of the instruction. However, as we concluded above, pursuant to both *Wolons* and *Williford*, because trial counsel informed the trial court of the need to provide an accident instruction, trial counsel did not forfeit error under Crim.R. 30(A) by neither submitting the proposed instruction in writing nor objecting to the trial court's failure to provide the instruction. Thus, we would not reverse appellant's conviction based on this proposed argument change. The results of appellant's appeal would not have been different if counsel had made this change to the argument, and appellate counsel did not render ineffective assistance in the appeal.

> For all these reasons, we conclude that the result of appellant's appeal would not have been different had appellate counsel, before filing appellate briefs, spoken with trial counsel and learned about trial counsel's request for an accident instruction. Accordingly, appellant has not demonstrated a genuine issue as to whether he was deprived the effective assistance of counsel on appeal. Therefore, we deny appellant's App.R. 26(B) application to reopen. *See State v. Banks*, Franklin App. No. 03AP-1286, 2005-Ohio-1943, ¶ 26 (denying an App.R. 26[B] motion upon concluding that the proposed assignments of error are "not well-taken" and, thus, that "appellant has failed to meet his burden to demonstrate that there is a genuine issue as to whether he was deprived the effective assistance of counsel on appeal").

*State v. Martin,* Case No. 07AP-362, 2008 WL 2588618 at *1 - *6 (Ohio App. 10th Dist. June 30, 2008).

Again, the factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e).  Additionally, this Court may not grant habeas corpus relief unless the state court's decision contravened or unreasonably applied clearly established federal law or resulted in an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d), (e).   The record fails to reflect such circumstances here.

Assuming that petitioner has properly preserved Claim One for federal habeas corpus review, the claim is without merit.  The state appellate court concluded that a jury instruction on accident was not necessary in view of the jury instructions issued on the definition of recklessness, reckless homicide, and the burden of proof required to establish that petitioner acted "recklessly."  This conclusion involves the interpretation of state law to which this Court must defer. *Adams v. Smith*, 280 F.Supp.2d 704, 721 (E.D. Mich.

2003)(citing *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)); *Israfil v. Russell*, 276 F.3d 768, 771 (6th Cir. 2001).  Further, the record fails to reflect that the state court's decision is unreasonable so as to justify federal habeas corpus relief.  *See, e.g., State v. Howell*, 137 Ohio App.3d 804, 813-814 (2000)(no error in failure to issue accident instruction where jury instruction on definition of recklessness)(citing *State v. Tiber*, 1990 WL 65359 (Ohio App. 7th Dist. May 17, 1990)); *see also State v. Skeens*, 2001 WL 1647210 *3-*4 (Ohio App. 7th Dist. Dec. 19, 2001).

> Reckless conduct goes beyond what is considered to be an accident.  *State v. Martin,* Franklin App. No. 07AP-362, 2007-Ohio-7152, at ¶ 53. Indeed, an accident claim is inconsistent with recklessness; accident is an unintentional act that denounces a culpable mental state. *State v. Fears,* 86 Ohio St.3d 329, 340, 1999-Ohio-111; *State v. Barnd* (1993), 85 Ohio App.3d 254, 260; *State v. Skeens,* Noble App. No. 286, 2001-Ohio-3476.

*State v. Easley,* No. 07AP-578, 2008 WL 324406 *12 (Ohio App. 10th Dist. Feb. 7, 2008).

For these reasons, the undersigned finds Claim one is without merit.

## CONCLUSION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or

47

recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

<u>/s/ Elizabeth A. Preston Deavers</u>
ELIZABETH PRESTON DEAVERS
United States Magistrate Judge

Date: June 9, 2010